*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JOHN C. HAEDRICH,

        Plaintiff-Appellant,

v

JOSHUA M. AKERS,

        Defendant-Appellee,

and

LAURA WOLF-POWERS, CITY UNIVERSITY OF NEW YORK, CHARLOTTE VORMS, and UNIVERSITY PARIS 8,

        Defendants.

UNPUBLISHED
April 16, 2019

No. 342342
Wayne Circuit Court
LC No. 17-013471-CZ

Before: RIORDAN, P.J., and MARKEY and LETICA, JJ.

PER CURIAM.

In this defamation action, plaintiff appeals by right the trial court's order granting summary disposition in favor of defendants Joshua M. Akers, City University of New York (CUNY), and Laura Wolf-Powers. The record reflects that the remaining defendants, Charlotte Vorms and University Paris 8, were never served with plaintiff's complaint and did not appear in the lawsuit. On appeal, plaintiff only challenges the summary dismissal of his claims against Akers. The trial court ruled that Akers was shielded by qualified governmental immunity, which plaintiff failed to overcome as a matter of law. We affirm.

In a complaint that plaintiff had amended several times by right, he alleged that he owned and operated Sussex Immoblier, LLC (SIL), which was formerly a Michigan limited liability company that was later converted to a Wyoming limited liability company. Plaintiff asserted that he invested in real property throughout the city of Detroit through SIL. Plaintiff claimed that Akers wrote an article about plaintiff and SIL in *Metropolitiques*, that it was published online, and that it accused plaintiff and SIL of operating a business with malicious intent and

racial overtones. The following passage from the article served as the primary basis for plaintiff's suit:

> But the dominance of bulk buyers in the REO [real estate owned] market pales in comparison to their activity in the Wayne County tax foreclosure auction, where most properties are purchased for the minimum bid of $500. Between 2006 and 2015, speculative investors accounted for nearly 90% of all purchases. Over 40% of those purchases were bulk buys of 50 or more properties (Wayne County Treasurer 2015).

> This is the new class of owners that DED [Detroit Eviction Defense] has found itself battling on a regular basis over the past two years. Though campaigns against banks such as Flagstar and Bank of America continue, more recent opponents are . . . companies such as Thor Real Estate and *Sussex lmmobilier*. These limited-liability companies, run respectively by Eric and Shelia Tomasi, and *John Haedrich*, operate in predominantly Black, inner-city neighborhoods in Detroit and Cleveland (Property Praxis 2016; Akers 2013). They utilize a combination of land contracts and direct sales, and use the full power of the state to enforce property rights *through rapid and increasingly violent evictions*. [Emphasis added.[1]]

---

[1] The complaint also placed some reliance on earlier language in the article, which provided:

> In early June 2016, Jenette Shannon and her teenage son were evicted from their home in northwest Detroit. Shannon, working with DED, was fighting to keep her home when a bailiff, flanked by a dozen police officers threatening felony charges for disobeying orders, pushed through the defense to serve the eviction. As the bailiff departed, police lined the sidewalk and stairs leading to the home. The hired eviction crew emptied the house of Shannon's belongings into a dumpster as Shannon's son slumped on the lawn exhausted and in tears.

> Earlier that day, prior to the bailiff's arrival, the Shannon defense became violent as those hired to perform the eviction—haulers and day laborers— attacked DED members, shoving some to the ground, body-slamming another, and breaking one man's ankle as a dumpster hauler drove through the defense line. An officer from the Detroit Police Department watched the assault from his own vehicle. The bailiff returned later in the day with a dozen officers who threatened felony arrest for anyone impeding the eviction and mocking those defending Shannon's house as her belongings were tossed into a dumpster. For DED members, the assault was an escalation but not unexpected. A defense earlier in the year involved increasing forms of intimidation by property owners, including phone calls threatening members and sending work crews in to cut down a mature tree in front of the home being defended (Akers 2016a).

In the complaint, plaintiff alleged that Akers' article insinuated that plaintiff "is a racist, not motivated to own property but motivated to strip 'black people' of their property" and that Akers falsely accused plaintiff's agents, knowingly so, of committing assaults during court-ordered evictions. Plaintiff further alleged in the complaint:

17. Plaintiff has not sold ANY property he has owned on a land contract, nor has he ever effectuated anything near a "violent" eviction as depicted by the false statements made by . . . Akers, nor has [p]laintiff ever invested in any property in Cleveland whatsoever.

18. Defendant Akers, upon information and belief, as a member of the [DED], a gang like group, motivated to stop legal evictions by force[] and fabrications, has published these defamatory lies to intimidate [p]laintiff.

19. Defendant Akers, upon information and belief, has intentionally published false statements to deter future income to [p]laintiff and to interfere with [p]laintiff's real estate investments.

20. Defendant Akers made no attempts to make any reasonable investigation whatsoever of the allegations in which the article he wrote contains. His intent was malicious and grossly negligent in that he made up information on his own or relied on gang like group[s] such as the [DED] for information.

In Count I of his complaint, plaintiff alleged libel, claiming that his business was defamed in the article. And in Count II of the complaint, plaintiff alleged libel, claiming defamation predicated on false assertions of criminal conduct.

Akers did not file an answer to the complaint, choosing instead to file a motion for summary disposition pursuant to MCR 2.116(C)(7) and (8). Akers contended that plaintiff's claims were barred by qualified governmental immunity and that plaintiff failed to plead in avoidance of governmental immunity. In support of this argument, Akers presented evidence that, when he authored the article in *Metropolitiques*, he was an employee of the University of Michigan-Dearborn, working and writing as a tenure-track professor.[2] Akers additionally argued

---

[2] In his affidavit, Akers averred:

1. Since 2013, I have been continuously employed by the University of Michigan-Dearborn in the Department of Social Services as a tenure-track Assistant Professor of Geography and Urban and Regional Studies. . . . .

2. My primary research and scholarship interests are the intersection of markets and policy and its material impacts on urban neighborhoods and everyday life. I am an economic geographer whose work focuses on property, policy, and social movements.

that plaintiff failed to state a claim upon which relief could be granted because the libel counts were barred by the fair-reporting privilege contained in MCL 600.2911(3), and his statements did not rise to the level of actionable defamation.[3] In support, Akers attached documentary evidence revealing some communications by SIL to tenants. In a letter to two tenants renting a particular SIL home, after setting forth a number of litigation threats, insults, and a favorable reference to Joseph McCarthy, an SIL agent stated, "In the meantime, why not consider a Habanero enema to soothe your nerves." Akers also submitted an affidavit from one of the tenants on the receiving end of the letter discussed in the preceding sentence. She averred that SIL agents engaged in threatening and insulting text messages and mailings which did not cease after the tenant's attorney instructed SIL to halt the communications. According to the affiant, one text message from SIL stated, " 'Looking forward to dropping a dumpster on my property.' " The tenant also described an act of surveillance, stalking, and harassment by an SIL agent.

Defendants CUNY and Laura Wolf-Powers, having filed a limited appearance in the action, filed a motion for summary disposition pursuant to MCR 2.116(C)(1), claiming lack of personal jurisdiction.[4] The trial court granted CUNY and Wolf-Powers's motion for summary disposition, and plaintiff does not challenge that ruling on appeal.

---

3. As a faculty member at the UM-Dearborn, I am expected to conduct research, publish, and contribute to the overall body of academic scholarship in my field. This expectation is a condition of promotion, tenure and retention with UM-Dearborn.

4. In 2017, I authored an article entitled *Contesting Economies of Displacement and Dispossession* in the web-based publication *Metropolitiques*. The subject-matter of this article was directly related to my field of study, and I completed work on the article within the scope and expectation of my employment with UM-Dearborn.

[3] Akers' affidavit indicated that his article was drawn from review of public property records, examination of publicly-available legal documents, direct observations in the Shannon eviction case, "and interviews with witnesses and participants in the case of [SIL]."

[4] Plaintiff had alleged in his complaint that *Metropolitiques* is an editorially peer-reviewed online journal that publishes essays and papers aimed at an international audience, that the journal is located at CUNY's Center of Urban Research, and that Wolf-Peters is an editorial director at CUNY. Plaintiff accused CUNY and Wolf-Peters of intentionally permitting the publication of false and defamatory statements in Akers' article. Plaintiff further alleged that CUNY and Wolf-Peters refused to remove or take down the defamatory article. In regard to defendants Charlotte Vorms and University Paris 8, plaintiff had alleged that Vorms is an editorial director with *Metropolitiques* and an associate professor at University Paris 8. Again, it appears from the record that these two defendants were never successfully served with the complaint, so they never appeared in the case.

Plaintiff filed a response to Akers' motion for summary disposition. With respect to the governmental immunity argument, plaintiff maintained that Akers was not engaged in a governmental function when he wrote the article because publishing articles is not explicitly authorized by law as a function of government, which is required to satisfy the elements of immunity. As an alternative argument should the trial court side with Akers on immunity, plaintiff contended that he should be permitted leave to amend his complaint. Plaintiff indicated that it was not reasonably foreseeable that Akers had been engaged in a governmental function in penning the article; therefore, plaintiff wanted an opportunity to amend the complaint to add allegations under the proprietary-function exception to governmental immunity, MCL 691.1413. Next, plaintiff asserted that claiming substantial truth based on public records was not a defense to his defamation claims where there was no public record stating that plaintiff had engaged in "violent evictions" in "predominantly black neighborhoods." Plaintiff did not respond to Akers' argument under the fair-reporting privilege, and plaintiff did not attach any documentary evidence to his response brief. In a reply brief, Akers argued that plaintiff confused governmental immunity under the governmental tort liability act (GTLA), MCL 691.1401 *et seq.*, with common-law immunity. Akers additionally contended that amendment of plaintiff's complaint would be futile. Finally, Akers pointed out that plaintiff had failed to respond to his argument under the fair-reporting privilege, MCL 600.2911(3).[5]

At the hearing on the motions for summary disposition, the trial court ruled from the bench, initially determining that the court lacked personal jurisdiction over CUNY and Wolf-Powers. The court then moved on to address plaintiff's defamation claims against Akers. The trial court concluded that the libel claims were barred by qualified governmental immunity, considering that plaintiff failed to present any evidence rebutting Akers' affidavit and that the affidavit established the elements of governmental immunity as a matter of law. The court stated that Akers, therefore, was entitled to summary disposition under MCR 2.116(C)(7).[6] An order to that effect was later entered by the trial court. The court never reached Akers' arguments concerning the fair-reporting privilege and failure to state a claim, MCR 2.116(C)(8). Plaintiff appeals as of right.

We review de novo a trial court's ruling on a motion for summary disposition. *Moraccini v City of Sterling Hts*, 296 Mich App 387, 391; 822 NW2d 799 (2012). This Court likewise reviews de novo the applicability of governmental immunity and the statutory exceptions to immunity. *Id.* MCR 2.116(C)(7) provides for dismissal of an action "because of . . . immunity granted by law." The moving party may submit affidavits, depositions, admissions, or other

---

[5] MCL 600.2911(3) provides, in part, that "[d]amages shall not be awarded in a libel action for the publication or broadcast of a fair and true report of matters of public record, a public and official proceeding, or of a governmental notice, announcement, written or recorded report or record generally available to the public, or act or action of a public body, or for a heading of the report which is a fair and true headnote of the report."

[6] In a very brief comment from the bench related to plaintiff's request to amend his complaint, the trial court noted that plaintiff had filed four complaints without presenting an exception to governmental immunity. The court said nothing more on the matter.

documentary evidence in support of the motion if substantively admissible. *Odom v Wayne Co*, 482 Mich 459, 466; 760 NW2d 217 (2008). The contents of the complaint must be accepted as true unless contradicted by the documentary evidence. *Id.* This Court must consider the documentary evidence in a light most favorable to the nonmoving party for purposes of MCR 2.116(C)(7). *Moraccini*, 296 Mich App at 391. When there is no factual dispute, the determination whether a plaintiff's claim is barred under a principle set forth in MCR 2.116(C)(7) is a question of law for the court to decide. *Id.* If, however, a relevant factual dispute does exist, summary disposition is not appropriate. *Id.*[7]

To establish a claim of defamation under a libel theory, a plaintiff must prove or show: (1) the existence of a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication of the statement to a third party, (3) fault that amounts to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. *Edwards v Detroit News, Inc*, 322 Mich App 1, 12; 910 NW2d 394 (2017); *Collins v Detroit Free Press, Inc*, 245 Mich App 27, 32; 627 NW2d 5 (2001).

In reviewing plaintiff's complaint, he refers to Akers' conduct in writing the defamatory article as being both intentional and grossly negligent, thereby presenting two separate underlying tort theories. Defamation can be in the form of an intentional tort. See *Randall v Delta Charter Twp*, 121 Mich App 26, 34; 328 NW2d 562 (1982) ("The Supreme Court's decisions concerning the avoidance of governmental immunity where intentional torts are involved relate to torts such as assault, . . . intentional interference with economic relations, *defamation* and slander.") (emphasis added). But defamation can also be premised on conduct that is grossly negligent. See *Edwards*, 322 Mich App at 12 (defamation requires fault that amounts to at least negligence). Governmental immunity can serve as the basis to summarily dismiss a defamation claim. See *Wallace v Recorder's Court of Detroit*, 207 Mich App 443, 447; 525 NW2d 481 (1995).

Absent a statutory exception, there is governmental immunity from tort liability when a governmental function is being performed. *Beals v Michigan*, 497 Mich 363, 378; 871 NW2d 5 (2015). The term " 'tort liability' as used in MCL 691.1407(1) means all legal responsibility arising from a non-contractual civil wrong for which a remedy may be obtained in the form of compensatory damages." *In re Bradley Estate*, 494 Mich 367, 385; 835 NW2d 545 (2013). Under the GTLA, "the burden . . . fall[s] on the *governmental employee* to raise and prove his

---

[7] In plaintiff's appellate brief, he refers, in part, to the clearly-erroneous standard of review, which applies to a trial court's factual findings. See MCR 2.613(C). That standard of review has no application whatsoever in the context of reviewing a court's decision on a motion for summary disposition. Indeed, a trial court is not permitted to make factual findings or resolve factual disputes when ruling on a motion for summary disposition. *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013).

entitlement to immunity as an affirmative defense." *Odom*, 482 Mich at 479 (emphasis added).[8] It is a basic principle of our state's jurisprudence that governmental immunity is to be construed broadly and that a statutory exception to immunity is to be narrowly interpreted. *Stanton v Battle Creek*, 466 Mich 611, 618; 647 NW2d 508 (2002).

In *Odom*, 482 Mich at 479-480, our Supreme Court addressed the issue of governmental immunity in relation to negligent torts and intentional torts, providing the following analytical framework with respect to each tort theory:

> To summarize and simplify the application of our decision, we provide these steps to follow when a defendant raises the affirmative defense of individual governmental immunity. The court must do the following:
>
> (1) Determine whether the individual is a judge, a legislator, or the highest-ranking appointed executive official at any level of government who is entitled to absolute immunity under MCL 691.1407(5).
>
> (2) If the individual is a lower-ranking governmental employee or official, determine whether the plaintiff pleaded an intentional or a negligent tort.
>
> (3) If the plaintiff pleaded a negligent tort, proceed under MCL 691.1407(2) and determine if the individual caused an injury or damage while acting in the course of employment or service or on behalf of his governmental employer and whether:
>
> (a) the individual was acting or reasonably believed that he was acting within the scope of his authority,
>
> (b) the governmental agency was engaged in the exercise or discharge of a governmental function, and
>
> (c) the individual's conduct amounted to gross negligence[9] that was the proximate cause of the injury or damage.

---

[8] Akers contends that plaintiff was required to plead in avoidance of governmental immunity in his complaint. This is not an accurate statement of law. "A plaintiff filing suit against a *governmental agency* must initially plead his claims in avoidance of governmental immunity." *Odom*, 482 Mich at 478-479 (emphasis added). Because defendant Akers is a governmental employee and not a governmental agency, the burden rested on Akers to prove the affirmative defense of governmental immunity. *Id.* at 479; see also *Ray v Swager*, 501 Mich 52, 62; 903 NW2d 366 (2017); *Petersen Fin LLC v City of Kentwood*, __ Mich App __, __; __ NW2d __ (2018); slip op at 8.

[9] "Gross negligence" is statutorily defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a).

(4) If the plaintiff pleaded an intentional tort, determine whether the defendant established that he is entitled to individual governmental immunity under the *Ross* [*v Consumers Power Co*, 420 Mich 567; 363 NW2d 641 (1984),] test by showing the following:

(a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,

(b) the acts were undertaken in good faith, or were not undertaken with malice, and

(c) the acts were discretionary, as opposed to ministerial.

On appeal, plaintiff first argues that Akers was not engaged in a governmental function when he wrote the article: publishing an article is not a governmental function explicitly authorized by law as required to be afforded immunity protection. Interwoven in this argument, plaintiff contends that Akers was acting outside the scope of his authority in authoring the article in *Metropolitiques*. Although subtle and nuanced, we initially note that whether Akers' activity was part of or fell under a governmental agency's exercise or discharge of a governmental function is a separate question from whether Akers was working within the scope of his authority when engaged in the activity. See *Beals*, 497 Mich at 371; *Odom*, 482 Mich at 479-480. We first address whether Akers was working within the scope of his authority when he wrote the article.

With respect to establishing that a lower level governmental employee was working within the scope of his authority, it must be shown that the employee was engaged in the service of his employer at the time of the conduct at issue or was going about the employer's business. *Matouk v Mich Muni League Liability & Prop Pool*, 320 Mich App 402, 416; 907 NW2d 853 (2017). It is, however, not synonymous with an act that merely occurs during the period covered by the employee's employment. *Id.* As indicated earlier in this opinion, Akers executed an affidavit, averring as follows:

3. As a faculty member at the UM-Dearborn, I am expected to conduct research, publish, and contribute to the overall body of academic scholarship in my field. This expectation is a condition of promotion, tenure and retention with UM-Dearborn.

4. In 2017, I authored an article entitled *Contesting Economies of Displacement and Dispossession* in the web-based publication *Metropolitiques*. The subject-matter of this article was directly related to my field of study, and I completed work on the article within the scope and expectation of my employment with UM-Dearborn.

These averments constituted evidence showing that Akers was working within the scope of his employment when he authored the article in *Metropolitiques*. And because plaintiff failed to provide any documentary evidence to the contrary, we conclude there is no factual dispute on

the issue. Therefore, we hold as a matter of law that Akers was working within the scope of his employment when he penned the article at issue.

We next address plaintiff's contention that Akers was not engaged in a governmental function when he authored the article. We first note that plaintiff's framing of the issue is not technically correct. The question is not whether Akers was engaged in a governmental function; the question is whether he was acting as an employee of a *governmental agency* that was engaged in the exercise or discharge of a governmental function. See *Beals*, 497 Mich at 371 ("There is no dispute regarding whether defendant . . . acted within the scope of his authority as an employee of a governmental agency engaged in the exercise of a governmental function."); *Odom*, 482 Mich at 480 ("determine if the individual caused an injury or damage while acting in the course of employment . . . and whether . . . the governmental agency was engaged in the exercise or discharge of a governmental function").

A "governmental function" is defined as "an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." MCL 691.1401(b). In determining whether a governmental agency was engaged in the exercise of a governmental function, the focus must be on the "general activity," not on the particular conduct involved at the time the alleged tort was committed. *Tate v Grand Rapids*, 256 Mich App 656, 661; 671 NW2d 84 (2003); see also *Margaris v Genesee Co*, 324 Mich App 111, 126; 919 NW2d 659 (2018) (emphasizing that the focus must be on an agency's general activity and not on the specific conduct giving rise to the alleged tort). The improper performance of an activity authorized by law is, regardless of the impropriety, still authorized for purposes of the governmental function test. *Richardson v Jackson Co*, 432 Mich 377, 385; 443 NW2d 105 (1989). A governmental agency is not engaged in the exercise or discharge of a governmental function when it lacks the legal authority to perform the activity "in any manner." *Id.*

"[T]he operation of a state university is a governmental function immune from tort liability." *Holzer v Oakland Univ Academy of Dramatic Arts*, 110 Mich App 355, 360; 313 NW2d 124 (1981). Here, the governmental agency or entity is the University of Michigan, and its "general activity" is operating a state university. Indeed, MCL 390.2, which specifically concerns the University of Michigan, provides that "[t]he university shall provide the inhabitants of this state with the means of acquiring a thorough knowledge of the various branches of literature, science and arts." See also MCL 390.1 *et seq.*; Const 1963, art 8, §§ 4 and 5. Accordingly, the University of Michigan is expressly authorized and mandated by statute to operate an institution of higher learning and to provide Michiganders and other inhabitants with education in the various branches of academics. Operating the University of Michigan and educating the citizenry necessarily entail employing professors such as Akers to teach, to conduct research, and to author scholarly papers. As stated in his affidavit, Akers, as a faculty member, was "expected to conduct research, publish, and contribute to the overall body of academic scholarship in [his] field." There was no evidence to the contrary. Therefore, we hold, as a matter of law, that the "governmental function" element of governmental immunity was satisfied.

There is no dispute that Akers' act of authoring the article was discretionary and not ministerial in nature. And Akers' affidavit asserted that the article was drawn from review of

public property records, examination of publicly-available legal documents, direct observations in the Shannon eviction case, and interviews with witnesses and participants in matters involving SIL. These averments revealed an absence of bad faith, malice, or gross negligence. Plaintiff provided no documentary evidence to the contrary. Accordingly, Akers satisfied his burden of proving entitlement to governmental immunity as a matter of law. It is necessary, however, to address one more argument posed by plaintiff on the issue. Plaintiff maintains that this Court's decision in *Churchwell v Bd of Regents of the Univ of Mich*, 97 Mich App 463; 296 NW2d 75 (1980), compels reversal. Despite plaintiff's heavy reliance on *Churchwell*, Akers ignores the case altogether.

In *Churchwell*, this Court held that the operation of the University of Michigan Hospital was not protected by governmental immunity in a medical malpractice action. The Court reasoned:

> We do not find that the purpose, planning, and carrying out of the day to day operation of the University Hospital can be effectively accomplished only by the Government. We recognize that, from an economic standpoint, perhaps the operation of a medical school can only be so effectuated. This, in itself, is controvertible, however, when one considers that private institutions for the training of other health care professionals, such as dentists and nurses, do exist in the State. In any event, in applying the definition of governmental function, we must focus on the precise operation sought to be held immune rather than overall or principal departmental operations. In so doing, we find this case to be ruled by the *Parker* decision.[10] The operation of a University hospital is more like the operation of a general hospital than a mental hospital. According to *Parker*, . . . therefore, the operation is not protected by the cloak of governmental immunity. [*Churchwell*, 97 Mich App at 469 (citation omitted).]

*Churchwell*, aside from not constituting binding precedent, MCR 7.215(J)(1), and being entirely at odds with *Odom*, was effectively overruled because *Parker*, upon which *Churchwell* relied, has been rejected by our Supreme Court. In *Vargo v Sauer*, 457 Mich 49, 67 n 26; 576 NW2d 656 (1998), the Michigan Supreme Court observed:

> Plaintiff contends that the enactment of subsection 7(4)[11] means that the provision of medical treatment is not a governmental function, therefore restoring our ruling in *Parker* . . ., which held that public hospitals were not entitled to governmental immunity. We are unpersuaded by this argument because we determined in *Hyde v Univ of Michigan Bd of Regents*[, 426 Mich 223; 393

---

[10] *Parker v Highland Park*, 404 Mich 183; 273 NW2d 413 (1978).

[11] This is a reference to MCL 691.1407(4), which was enacted after *Churchwell* was decided, and which provides that the GTLA "does not grant immunity to a governmental agency or an employee or agent of a governmental agency with respect to providing medical care or treatment to a patient . . . ."

NW2d 847 (1986),] that *Ross* "impliedly overruled" *Parker*. Although none of the cases decided in *Ross* involved tort liability for medical malpractice, *Ross* rejected each definition of governmental function used in *Parker*. Thus, to the extent that *Parker* held that public hospital activities that are "expressly or impliedly mandated or authorized by constitution, statute, or other law . . . do not constitute a governmental function, *Parker* was impliedly overruled by *Ross*." [Citations omitted; final omission in original.]

Accordingly, *Churchwell* does not aid plaintiff on the governmental function issue, as the reasoning in *Churchwell* has been eviscerated.

Plaintiff next argues that it was not reasonably foreseeable that Akers had been engaged in a governmental function in penning the article; therefore, plaintiff was entitled to an opportunity to amend the complaint in order to add allegations under the proprietary-function exception to governmental immunity.

We review for an abuse of discretion a trial court's ruling on a motion to amend pleadings. *Ormsby v Capital Welding, Inc*, 471 Mich 45, 53; 684 NW2d 320 (2004). An abuse of discretion occurs when a trial court's decision results in an outcome falling outside a principled range of outcomes. *Woods v SLB Prop Mgt, LLC*, 277 Mich App 622, 625; 750 NW2d 228 (2008). "If the grounds asserted [in support of summary disposition] are based on subrule (C)(8), (9), or (10), the court shall give the parties an opportunity to amend their pleadings as provided by MCR 2.118, unless the evidence then before the court shows that amendment would not be justified." MCR 2.116(I)(5). "Leave shall be freely given when justice so requires." MCR 2.118(A)(2). A motion to amend a complaint should ordinarily be granted unless there exists undue delay, bad faith or a dilatory motive, repeated failures to cure deficiencies with prior amendments, futility, or undue and actual prejudice. *Weymers v Khera*, 454 Mich 639, 658-659; 563 NW2d 647 (1997).

MCL 691.1413 provides:

The immunity of the governmental agency shall not apply to actions to recover for bodily injury or property damage arising out of the performance of a proprietary function as defined in this section. Proprietary function shall mean any activity which is conducted primarily for the purpose of producing a pecuniary profit for the governmental agency, excluding, however, any activity normally supported by taxes or fees. No action shall be brought against the governmental agency for injury or property damage arising out of the operation of proprietary function, except for injury or loss suffered on or after July 1, 1965.

The activity must be conducted primarily for the purpose of producing a pecuniary profit, and the activity cannot normally be supported by taxes or fees. *Dextrom v Wexford Co*, 287 Mich App 406, 421; 789 NW2d 211 (2010).

Allowing plaintiff to amend his complaint to add allegations regarding the proprietary-function exception to governmental immunity, MCL 691.1413, would have been futile. The statutory exception precludes immunity for a "governmental agency" engaged in a proprietary

-11-

function; the statute makes no mention of governmental employees. Moreover, the proprietary-function exception applies "to actions to recover for bodily injury or property damage," MCL 691.1413, neither of which fits plaintiff's action for defamation. Finally, there is no indication in the record that publishing the article was for the purpose of producing a pecuniary profit or that it actually did so. Because an amendment of the complaint to add allegations regarding the proprietary-function exception would have been futile, we can find no error in not allowing the amendment.[12]

We affirm. Having fully prevailed on appeal, Akers may tax costs under MCR 7.219.

/s/ Michael J. Riordan
/s/ Jane E. Markey
/s/ Anica Letica

---

[12] Plaintiff also maintains that claiming substantial truth based on public records was not a defense to his defamation claims, where there was no public record stating that plaintiff had engaged in "violent evictions" in "predominantly black neighborhoods." However, the trial court never reached this issue, nor is it necessary for us to do so. We further note that Akers argues that plaintiff failed to state a claim upon which relief could be granted, given that the libel counts are barred by the fair-reporting privilege in MCL 600.2911(3) and that the allegations do not rise to the level of defamation. In light of our ruling, we need not reach these issues. Moreover, the trial court did not address the arguments. That said, with respect to the fair-reporting privilege, Akers' *uncontroverted* affidavit would appear to support application of the privilege. But we do question Akers' assertion that the allegations in plaintiff's complaint did not rise to the level of defamation.